UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                                    Chapter 11

Journal Register Company, *et al.*,                       Case No. 09-10769 (ALG)


                                      Debtors.            (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## <u>MEMORANDUM OF OPINION</u>

APPEARANCES:

WILLKIE FARR & GALLAGHER LLP
   By:  Marc Abrams, Esq.
         Shaunna Jones, Esq.
         Jennifer Hardy, Esq.
         Tereance McLaughlin, Esq.
         Rita Mitchell, Esq.
Attorneys for the Debtors
787 Seventh Avenue
New York, NY 10019-6099

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
   By:  Jenette A. Barrow-Bosshart, Esq.
         Jessica M. Ward, Esq.
Attorneys for the Official Unsecured Creditors Committee
230 Park Avenue
New York, NY 10169-0075

MILBANK, TWEED, HADLEY & MCCLOY LLP
   By:  Dennis C. O'Donnell, Esq.
         Lena Mandel, Esq.
         Jeremy S. Sussman, Esq
Attorneys for JP Morgan Chase Bank, N.A.
One Chase Manhattan Plaza
New York, NY 10005-1413

COHEN, WEISS & SIMON LLP
   By:  Richard M. Seltzer, Esq.
Attorneys for Newspaper Guild/Communication Workers of America
330 West 42nd Street
New York, NY 10036-6976

CENTRAL STATES PENSION FUND
   By:   Brad R. Beliner, Esq.
           Cathy L. Rath, Esq.
9377 West Higgins Road
Rosemont, IL 60018

STATE OF CONNECTICUT
OFFICE OF THE ATTORNEY GENERAL
   By:   Denise Mondell, Esq., Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120

PHILIP P. KALODNER, Esq., *pro se*
208 Righters Mill Rd.
Gladwyne, PA 19035

RICHARD M. FREEMAN, *pro se*
220 Linden St Ste 901
Scranton PA 18503

UNITED STATES TRUSTEE'S OFFICE
SOUTHERN DISTRICT OF NEW YORK
   By:   Serene K. Nakano, Esq.
33 Whitehall Street
21st Floor
New York, NY 10004


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

       Journal Register Company and 26 affiliates (collectively, the "Debtors") filed for

bankruptcy protection under chapter 11 of the Bankruptcy Code on February 21, 2009

(the "Petition Date").  The Debtors have moved for confirmation of their Amended Joint

Plan of Reorganization, dated May 6, 2009 (the "Plan").  The Plan is in part the result of

prepetition negotiations between the Debtors and JP Morgan Chase Bank, N.A., acting as

the administrative and collateral agent (the "Administrative Agent") for the Debtors'

prepetition lenders (the "Secured Lenders"), who have a perfected first priority lien on

substantially all of the Debtors' assets.  The Plan was subsequently amended as the result

of negotiations with the Official Committee of Unsecured Creditors appointed in these cases (the "Creditors Committee"), and the Secured Lenders and the Committee both support confirmation of the Plan.[1]

Three of the Debtors' unsecured creditors filed objections to confirmation of the Plan: (i) Central States, a multiemployer pension plan and member of the Creditors Committee, which has filed proofs of claim against the Debtors in the aggregate amount of $4.3 million on behalf of approximately 46 of the Debtors' employees; (ii) the Newspaper Guild/Communication Workers of America (the "Guild"), a collective bargaining representative for employees of the Debtors and also a member of the Creditors Committee; and (iii) the State of Connecticut, which has asserted a tax deficiency claim against the Debtors for approximately $21.5 million. Confirmation is also opposed by two *pro se* shareholders (the "Minority Shareholders"), who in the aggregate claim to own 7% of the Debtors' outstanding common stock.

Based on the evidence of record and upon the following findings of fact and conclusions of law, the Court confirms the Plan.

## BACKGROUND

### *The Debtors' Business and Capital Structure*

Formally established in 1997, the Debtors are a national media company that own and operate daily newspapers and non-daily publications, news and employment websites, and commercial printing facilities. The Debtors operate in six geographical "clusters": greater Philadelphia; metropolitan Detroit and other areas of Michigan; Connecticut; Ohio; and the Capital-Saratoga and Mid-Hudson regions of New York. As

---

[1] The Creditors Committee is comprised of three general unsecured creditors: (i) The Newspapers Guild/Communication Workers of America; (ii) Central States, Southeast and Southwest Areas Pension Fund ("Central States"); and (iii) RR Donnelley & Sons Company.

of the Petition Date, the Debtors operated 20 daily newspapers, 159 non-daily publications, 148 local news and information websites, and 14 printing facilities. They had 3,465 employees, 18% of whom were employed pursuant to collective bargaining agreements.

The Debtors have approximately $695 million in outstanding prepetition indebtedness to the Secured Lenders under credit agreements (the "Credit Agreements") secured by first priority liens on substantially all of the Debtors' assets. The validity and enforceability of the Secured Lenders' liens are undisputed. In March 2009, the Court approved a stipulation for the use of cash collateral in which the Debtors stipulated that the Secured Lenders' liens were properly perfected and valid, and provided the Creditors Committee with a period of time after its appointment to investigate and challenge the liens. The Creditors Committee, appointed on March 3, 2009, did not challenge the validity or perfection of the Secured Lenders' liens, and the time to do so has lapsed.

The Debtors' unsecured debt is estimated at $27 million, $6.6 million of which is allegedly owed to trade creditors. Equity is comprised of one class of common stock, with approximately 48 million shares outstanding. The Debtors' common stock was publicly traded until July 2008, when SEC registration terminated.

### Events Leading to Bankruptcy

The Debtors have sustained net operating losses for at least the last two years. They attribute the losses to an industry-wide decline in readership, circulation and revenue, caused by increased competition from other forms of media (such as the internet), the global recession, and weak advertising demand. In the fall of 2007, the Debtors began efforts to reduce operating costs, and by early 2008 they had closed 53

unprofitable publications and eliminated approximately $6.4 million in annual expenses. Between 2006 and 2008 the Debtors reduced their labor force by approximately 1,475 full-time positions.

In spite of their cost-cutting efforts, the Debtors were unable to comply with certain financial covenants under their Credit Agreements.  In July 2008, the Debtors and the Secured Lenders entered into a forbearance agreement that required the Debtors to retain a restructuring advisor and deliver a five-year business plan along with a term sheet setting forth the terms of a comprehensive restructuring plan for the company.  In exchange, the Secured Lenders agreed to waive the Debtors' defaults until October 31, 2008.  The Debtors retained Conway, Del Genio, Gries & Co., LLC ("CDG") to provide restructuring management services and Robert Conway to act as their chief restructuring officer.  On the Petition Date, Robert Conway became the Debtors' interim chief operating officer.

Assisted by CDG, the Debtors delivered a five-year business plan and negotiated an extension for the completion of the term sheet to February 6, 2009.  On February 13, 2009, after further negotiations with the Secured Lenders, the Debtors delivered a term sheet, which served as the basis for a plan support agreement entered into with a super-majority of the Secured Lenders (the "Consenting Lenders").  This support agreement, in turn, led to the chapter 11 plan of reorganization the Debtors filed with the Court on the Petition Date, and indirectly to the amended version presented for confirmation.

***The Reorganization Plan***

As more fully explained below, the Debtors' Plan proposes, among other things, to (i) deleverage the Debtors by converting the Secured Lenders' debt into 100% of the

new equity of the Reorganized Debtors and new tranche A and B secured loans; (ii) make

certain distributions to the unsecured creditors class; (iii) cancel the old equity; and (iv)

establish a Post-Emergence Incentive Plan.  As one of the "means of execution" of the

Plan, but not as a matter of Plan classification and distribution, it is also proposed that

there be a further payment to certain of the unsecured creditors, the so-called "trade

creditors," from a purported "gift" of the Secured Lenders.

### i.  *Classes and Distributions*

Claims and interest are divided into six classes.  Classes 1 and 3 are comprised of

Priority Non-Tax Claims and Other Secured Claims in the estimated amounts of $0.59

million and $2.6 million, respectively.[2]  Under the Plan, both classes would receive full

payment.  Existing Equity Interests and Existing Securities Laws Claims are classified in

classes 5 and 6, respectively.[3]  The Plan provides no distribution to these two classes and

for the cancellation of the existing shareholders' stock.

Class 2 of the Plan encompasses the Secured Lenders, who, as previously stated,

hold estimated claims of approximately $695 million, which aggregates approximately

96% of the total debt, secured by substantially all of the Debtors' assets.  The members of

this class are to receive the following distribution under the Plan in full satisfaction of

their claims: (i) 100% of the new common stock of the Reorganized Debtors;[4] (ii)

---

[2] "Other Secured Claim means any Secured Claim against a Debtor other than a Secured Lender Claim." (Amended Joint Plan, §1.77, ECF Doc. No. 304.)

[3] All the shareholders for the Debtors comprise Existing Equity Interests.  Existing Securities Laws Claims are defined as claims arising from rescission of a purchase or sale of equity securities of the Debtors or for violations of the securities laws.  (Plan, §§ 1.46, 1.50, ECF Doc. No. 304.)

[4] The new common stock will be subject to certain restrictions on transfer.  It will also be subject to a 20% dilution by common stock options that may be issued to the Reorganized Debtors' post-effective date directors, officers and employees, as well as common stock and warrants that may be issued in connection with an exit financing facility.

assumption by the Reorganized Debtors of new indebtedness, consisting of tranche A and B loans in the aggregate amount of $225 million, secured by first and third liens on all the assets of the Reorganized Debtors, bearing interest of up to 15% per annum and maturing in four and five years from the effective date of the Plan, respectively; and (iii) payment in cash of any fees due to the Secured Lenders' professionals in connection with these cases. The Debtors' financial advisor, Eric R. Mendelsohn, a managing director of Lazard Frères & Co., LLC, testified without contradiction at the confirmation hearing that the mid-point of the estimated enterprise value of the Reorganized Debtors was at most $300 million. It is therefore undisputed on the record of the confirmation hearing that based on these values the package of consideration made available to the members of Class 2 would constitute a recovery of only 42% of their claims. Using the liquidation analysis that the Debtors included as part of their Disclosure Statement and that was also unchallenged, in a chapter 7 liquidation the Secured Lenders would receive a distribution on their claims of less than 20%.

The Plan provides for a *pro rata* distribution of $2 million to all of the Debtors' general unsecured creditors, who are classified in Class 4. It is estimated that the general unsecured creditors are owed approximately $27 million, and that a *pro rata* distribution would result in an approximate 9% recovery to each general unsecured creditor. (Disc. Statement, Art. II, p. 10 and Art 6.6(b)(4), ECF Doc. No. 305.) In addition, as mentioned above, the Secured Lenders have also agreed to fund an additional "gift," which has been labeled as a "Trade Account Distribution" and will be payable to certain unsecured creditors in accordance with the following criteria: (i) the creditor holds a "Trade

Unsecured Claim," as defined in the Plan;[5] (ii) the creditor does not object to the

confirmation of the Plan; and (iii) the creditor consents to the release of any claim against

the Debtors and the Secured Lenders arising during these cases or from confirmation of

the Plan.  The Debtors' Disclosure Statement states that "[t]he grant of such releases to

the Lenders by the creditors that will receive the Trade Account Distributions is the

linchpin of such Lenders' willingness to contribute such funds that they would otherwise

retain on account of their Secured Claims." (Disclosure Statement, § 6.16(b), p. 62, ECF

Doc. No. 305.)   At the confirmation hearing, Robert Conway testified that the Trade

Account Distribution was critically important to the future of the Reorganized Debtors

and their ability to fulfill their business plan, in that it would ensure the goodwill and

survival of certain trade creditors that were under severe financial stress themselves and

were essential to the Debtors' daily operations and long-term survival.

This additional "gift" will be placed in a so-called trade account that "shall not

constitute property of the Debtors or the Reorganized Debtors" and "[a]fter all Trade

Claim Payments have been distributed [ . . .] the undistributed portion of the Trade

Account Distribution, if any, shall become the sole and exclusive property" of the

Lenders. (Plan § 7.2, ECF Doc. No. 304.)  The Plan provides authority to the Court to

resolve any dispute that relates to the Trade Account Distribution, if necessary.  An

"Unsecured Claim Distribution Agent" is to make the *pro rata* distribution to unsecured

creditors with Class 4 claims, and a "Plan Distribution Agent" would be responsible for

the additional Trade Account Distribution and all other Plan distributions.  It is estimated

---

[5] Trade Unsecured Claim means any Unsecured Claim arising prior to the Petition Date relating to the receipt of goods or services by the Debtors from trade creditors or service providers in the ordinary course of the Debtors' business.  (Amended Joint Plan, §1.115, ECF Doc. No. 304.)

that the additional Trade Account Distribution will aggregate approximately $6.6 million.

(Debtors' Confirmation Memo of Law, ¶ 23, ECF Doc. No. 491.)

### ii.  *The Incentive Plan*

The Plan also establishes a so-called Post-Emergence Incentive Plan (the "Incentive Plan") for the benefit of certain employees of the Reorganized Debtors.  The Incentive Plan provides bonuses if the employees achieve certain goals the Debtors and the Consenting Lenders established in the plan support agreement.  The Debtors' Disclosure Statement describes the Incentive Plan, as follows:

> The Post-Emergence Incentive Plan was designed to incentivize those employees that were critical to the Company's efforts to implement the initial stages of the Business Plan, and to expeditiously confirm and consummate a plan of reorganization. To that end, the Performance Objectives for which Key Employees will receive an award under the Post-Emergence Incentive Plan are as follows: (i) the "shutdown objective," which was achieved upon the shutdown of substantially all of the publications slated for elimination in the Business Plan due to such publications' negative performance; (ii) the "Cost-Reduction Objective," which was achieved upon the targeted reduction of certain additional salary-related expenses as a result of the elimination and associated reconfiguration of operations and publications; and (iii) the "Emergence Objective," which will be earned upon consummation of a plan of reorganization for the Debtors.

(Disclosure Statement, § 11.1(c), ECF Doc. No. 305.)

### iii.  *Other Confirmation Provisions*

Post-effective date obligations and working capital needs of the Reorganized Debtors are to be funded primarily with cash from operations, which according to Robert Conway's testimony and CDG's projections will be sufficient to service annual debt obligations and capital expenditures of approximately $26 million and $10 million, respectively.  The Reorganized Debtors have also obtained exit financing in the form of a

9

$25 million three-year revolving credit facility that will provide liquidity and working capital. The revolving credit facility will be secured by first and second priority liens on certain assets of the Reorganized Debtors.

### iv. The Creditors Committee's Letter

In a letter addressed to all the unsecured creditors of the Debtors, the Creditors Committee urged them to vote in favor of the Plan because,

> as set forth in the Debtors' liquidation analysis, the only other alternative, a liquidation, would yield no recovery. . . . In addition, in the event of a liquidation, vendors and service providers would lose a customer, and thousands of people would become unemployed. The Debtors' prepetition debt structure is daunting. Furthermore, in this very difficult economic environment, the publishing and newspaper industry are facing unique and difficult challenges. The Plan is the product of intense efforts by and negotiations among the Debtors, the Committee, the Lenders, and various other parties. While the Committee sought to obtain greater recoveries for all unsecured creditors, it concluded that the recovery provided for in the Plan is the best recovery that could be obtained under the extremely difficult and challenging circumstances of these cases. The distributions provided for in the Plan reflect the efforts of the parties to resolve and compromise the issues created by these Chapter 11 cases and provide the best opportunity for the continuity of the business of the Debtors. The Committee believes that the Plan is in the best interest of the Debtors, their estates and the creditors.

(ECF Doc. No. 497.)

### v. Voting

The members of Class 2 overwhelmingly voted to accept the Plan, with 99.4% in amount and all but one member in number voting affirmatively. Class 4 also accepted the Plan with the overwhelming support of its members: 99.4% in amount and 97.7% in number voted to accept it. It was uncontested at the confirmation hearing that large supermajorities of both the recipients of the Trade Account Distribution and the non-

favored unsecured creditors voted in favor of the Plan, with more than 70% of the

affirmative vote of Class 4 coming from the non-favored creditors.  Classes 1 and 3 were

deemed to have accepted the Plan, and Classes 5 and 6 to have rejected it.  Because of the

deemed rejection of the Plan by Classes 5 and 6, the Debtors have moved for

nonconsensual confirmation (cramdown) under 11 U.S.C. §§ 1129(a) and (b).

### *The Objections to Confirmation*

As stated above, five objections have been filed to confirmation of the Plan.  One

of the objections, filed by Central States, relies on 11 U.S.C. §§ 1122 and 1129(b) of the

Bankruptcy Code and contends that the Plan discriminates unfairly among Class 4

unsecured creditors by allowing the Secured Lenders to provide a "gift" to some but not

all of the members of that class.  The Guild and the State of Connecticut oppose only that

part of the Plan that provides the above-described Incentive Plan.  The Minority

Shareholders filed the other two objections to confirmation on grounds that assert, insofar

as relevant to confirmation, that (i) the Plan is not feasible, and (ii) fails the best interests

test.

## DISCUSSION

"Confirmation of a plan of reorganization is the statutory goal of every chapter 11

case.  Section 1129 of the Bankruptcy Code provides the requirements for such

confirmation, containing Congress' minimum requirements for allowing an entity to

discharge its unpaid debts and continue its operations." *Bank of America Nat'l Trust and*

*Sav. Ass'n v. 2003 N. LaSalle Street Partnership*, 526 U.S. 434, 465, n. 4 (1999), quoting

7 *Collier on Bankruptcy* ¶ 1129.01, p. 1129-10 (15th ed. rev. 1998).  Where § 1129(a)(8)

cannot be satisfied because impaired classes fail to accept the plan or receive nothing and

are deemed to reject the plan, confirmation of a chapter 11 plan requires compliance with all the other requirements of § 1129(a) and also the "cramdown" provisions of § 1129(b). 11 U.S.C. § 1129(b)(1).  The plan proponent must establish that all applicable confirmation requirements have been met.  *See, e.g., In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr.S.D.N.Y. 1990); *In re Bolton*, 188 B.R. 913, 915 (Bankr.D.Vt. 1995).

The parties objecting to confirmation rely on § 1129(a)(1) (plan compliance with applicable provisions of title 11), § 1129(a)(4) (payments for services or costs under plan must be reasonable), § 1129(a)(7) (the best interests test), §1129(a)(11) (feasibility), as well as § 1129(b) (unfair discrimination).  The objections to the Incentive Plan also rely on § 503(c).  Since the evidence of record satisfies the Court that the Debtors' Plan complies with all other requirements of § 1129, the above provisions of the Bankruptcy Code will be the only sections discussed herein.  The Confirmation Order filed herewith sets forth the Plan's compliance with the other requirements of § 1129.

### A.    Central States' Objection

As stated above, Central States objects to the "gift" conferred on the trade creditors, arguing that the proposal constitutes unfair discrimination.  This objection presents the principal challenge to confirmation of the Debtors' Plan, and it raises an issue as to the application of the so-called "gift doctrine."

### i.  The Gift Doctrine

The gift doctrine dates from *Official Unsecured Creditors Committee v. Stern (In re SPM Manufacturing, Corp.)*, 984 F.2d 1305 (1st Cir. 1993), a converted chapter 7 case in which the Court of Appeals for the First Circuit held that a secured creditor is free to

"gift" its bankruptcy proceeds to junior creditors without regard to the distribution scheme of the Bankruptcy Code. There, a creditors committee, formed when the case was still in chapter 11, negotiated a cooperation agreement with the debtor's secured creditor, providing for the formulation of a joint plan of reorganization and for the sharing of proceeds resulting from either confirmation of a plan or a liquidation of the debtor's assets. Efforts to reorganize the debtor failed, and the assets of the debtor were sold for less than the debt owed to the secured creditor. Two days after the sale, a previously-entered order went into effect, granting relief from the automatic stay to the secured lender and converting the case to a chapter 7 liquidation.

When the creditors committee and the secured creditor requested distribution of the sale proceeds in accordance with their agreement, objections were filed by the debtor and its principal officers, who would be personally liable for unpaid taxes the debtor owed. The objections argued that the distribution proposed in the agreement violated the priority scheme of the Bankruptcy Code by providing payments to general unsecured creditors ahead of a priority tax debt. In reversing the lower courts, the Circuit Court concluded:

> Any sharing between [the secured creditor] and the general, unsecured creditors was to occur *after* distribution of the estate property, having no effect whatever on the bankruptcy distribution to other creditors.

> . . . Section 726 and the other Code provisions governing priorities of creditors apply only to distribution of property of the estate. The Code does not govern the rights of creditors to transfer or receive nonestate property. While the debtor and the trustee are not allowed to pay nonpriority creditors ahead of priority creditors, creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors.

13

> . . . There is nothing in the Code forbidding [secured creditors] to
> have voluntarily paid parts of these monies to some or all of the
> general, unsecured creditors after the bankruptcy proceeding
> finished.

*SPM Manufacturing,*, 984 F.2d at 1312-13 (emphasis in the original).

Application of the gift doctrine in chapter 11 cases has divided the courts.  Many courts have accepted the gift doctrine as applicable in chapter 11.  *See In re Union Fin. Servs. Group*, 303 B.R. 390, 423 (Bankr. E. D. Mo. 2003) ("There is no unfair discrimination in a Plan provision that allows the Senior Secured Lenders and the DIP Lenders voluntarily to assign to unsecured creditors cash collateral proceeds that otherwise would rightfully belong to the secured creditors, particularly in the context of a reorganization where continued relations with those unsecured creditors are important to the future business of the reorganized Debtors.");  *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 618 (Bankr. D.Del. 2001) (when gift is payable from proceeds otherwise distributable to senior secured creditors, they are "free to allocate such value without violating the 'fair and equitable' requirement" of 1129(b)); *In re Parke Imperial Canton, Ltd.*, 1994 WL 842777, at *11 (Bankr.N.D. Nov. 14, 1994) (secured creditor's plan contribution to one class of unsecured creditors but not to another is not unfair discrimination);  *In re MCorp. Financial, Inc.*, 160 B.R. 941, 960 (S.D. Tex. 1993) (senior secured creditor can "gift" under a plan if junior creditors receive as much "as what they would without the sharing.").

A few courts have generally rejected the doctrine, asserting that in the context of chapter 11

> [t]o accept [the] argument that a secured lender can, without any
> reference to fairness, decide which creditors get paid and how much
> those creditors get paid, is to reject the historical foundation of

> equity receiverships and to read § 1129(b) out of the Code . . . . To
> accept that argument is simply to start down a slippery slope that
> does great violence to history and to positive law.

*In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 865 (Bankr.S.D.Tex. 2001); *see also In re Snyders Drug Stores, Inc.*, 307 B.R. 889, n.11 (Bankr. N.D.Ohio 2004) ("The agreement at issue [in *SPM Mfg.*] was not proposed as part of the plan of reorganization, but was instead in the nature of a partial assignment or subordination agreement that was not subject to the code's confirmation requirements. Also, the property to be distributed was not property of the estate.").

Other courts have invalidated certain applications of the gift doctrine without rejecting it. In *In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005), a debtor had proposed a chapter 11 plan that divided unsecured creditors into two classes: an asbestos claimants class and a general unsecured creditors class. The plan required asbestos claimants to share a portion of their plan distribution with equity holders, but it did not provide full payment to the members of the general unsecured creditors class. The official creditors committee in the case objected to confirmation, arguing that the proposed distribution violated the absolute priority rule of § 1129(b) by providing value to equity over the objection of an impaired class of unsecured creditors. The debtors argued that the distributions were coming from proceeds otherwise payable to another group with its consent as allowed by the gift doctrine.

The Third Circuit agreed with the creditors committee and, in denying confirmation of the Plan as contrary to the absolute priority rule, stated that the gift doctrine cases "do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive." 432 F.3d at

514; *see also In re OCA, Inc.*, 2006 WL 3833929 at *84-89 (Bankr. E.D. La. Dec. 29, 2006) (same). The Third Circuit, however, did not reject the doctrine out of hand. *See In re World Health Alternatives, Inc.*, 344 B.R. 291, 298-299 (Bankr. D.Del. 2006) ("Armstrong distinguished, but did not disapprove" the gift doctrine; thus, settlement which provided secured creditor carve out to pay unsecured creditors ahead of priority creditors is appropriate). *See also In re WorldCom, Inc.*, 2003 WL 23861928 (Bankr.S.D.N.Y. Dec. 29, 2003), where the Court endorsed the gift doctrine notwithstanding another objection that it violated the absolute priority rule.

Finally, some courts reject application of the doctrine only when it is used for ulterior, improper ends.  In *In re Scott Cable Communications, Inc.*, 227 B.R. 596, 603-04 (Bankr.D.Conn. 1998), a debtor proposed to sell its assets pursuant to a plan of liquidation that provided for payments to all administrative, priority, and unsecured creditors from recoveries that were otherwise payable to secured creditors.  However, the plan did not provide payment for capital gain taxes attributable to the sale.  The Court denied confirmation on the ground that the principal purpose of the plan was the avoidance of taxes, contrary to § 1129(d), and it refused to approve the plan on the basis of the gift doctrine, distinguishing *SPM Manufacturing* as a chapter 7 case not subject to the confirmation requirements of §1129.  *See also In re CGE Shattuck, LLC*, 254 B.R. 5, 9 (Bankr.D.N.H. 2000) ("gift" not approved when proposed by secured creditor to lure unsecured creditors to reject chapter 11 plan and force a chapter 7 conversion in order to skirt the chapter 11 confirmation requirements).

The Court of Appeals for the Second Circuit has not decided the validity or scope of the gift doctrine in the plan confirmation context.  In *In re Iridium Operating LLC*, 478

F.3d 452 (2d Cir. 2007), the issue was whether a settlement based on a gift theory was consistent with the priority rules of the Bankruptcy Code.  The Court reserved the question whether the gift doctrine "could ever apply to Chapter 11 settlements."  *Id*. at 461.  On the other hand, the Court rejected a *per se* rule that another Circuit had adopted on the issue, and it remanded to the Bankruptcy Court for further findings of fact.

### ii. The Objection

Central States' objection that the Secured Lenders' "gift" is invalid incorrectly relies on statutory predicates 11 U.S.C. §§ 1122 and 1129(b).  Section 1122 governs the classification of claims and interests in a chapter 11 plan and is made applicable in the plan confirmation process through § 1129(a)(1), which conditions confirmation of a chapter 11 plan on compliance "with the applicable provisions of title 11."  11 U.S.C. § 1129(a)(1); *see also In re NII Holdings*, 288 B.R. 356, 359-362 (Bankr.D.Del. 2002).  Section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  Since all non-priority unsecured claims are classified in Class 4 of the Debtors' Plan, compliance with § 1122 is not at issue, and Central States' objection based on that provision is misplaced.  7 *Collier on Bankruptcy* at ¶ 1122.03[4][a].

Central States also relies on that part of § 1129(b) that prohibits nonconsensual or "cramdown" plans from discriminating unfairly against dissenting impaired classes. *See* 11 U.S.C. § 1129(b).  This provision prohibits unfair discrimination between classes of creditors with the same level of bankruptcy priority.  *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 636 (2d Cir. 1988).  The rule "looks at the treatment of a particular class of claims or interests, and compares it with other classes."  7 *Collier on Bankruptcy* at ¶

1129.04[4]. It is concerned with plan treatment between classes—not within classes. *Id*.

In these cases there is no charge of unfair discrimination between *classes* of creditors.

Therefore § 1129(b) is not violated by the Plan on the ground of unfair discrimination.[6]

Section 1129(b) of the Bankruptcy Code also requires that a cramdown plan

satisfy the fair and equitable or absolute priority rule.  This was the rule at issue in

*Armstrong*, and the fact that the so-called gift had the effect of undermining the priority

principles of the Code was the principal factor that the Circuit Court relied on in

reversing.   Here, there is no forced distribution from one class to a junior class over the

objection of an intervening dissenting or objecting class.  The "gift" by a small group of

Secured Lenders is wholly consensual on their part, and there is no contention that they

are making the "gift" to another class over the dissent of an intervening class.

The only objection to plan confirmation that could be made by a creditor such as

Central States that claims to be damaged by unequal treatment when compared to

members of its class is under § 1123(a)(4) of the Bankruptcy Code.  This section

advances the policy of equality of distribution of estate property in bankruptcy law by

requiring that a plan "provide the same treatment for each claim or interest of a particular

class, unless the holder of a particular claim or interest agrees to a less favorable

treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4); *see also In re*

*Combustion Engineering, Inc.,* 391 F.3d 190, 239 (3d Cir. 2004).  Section 1123(a)(4) also

applies to the confirmation of plans through §1129(a)(1). *See NII Holdings*, 288 B.R. at

359-362.

---

[6] Even if this were not so, § 1129(b) prohibits only "unfair discrimination."  As discussed below, the Debtors introduced substantial evidence as to why certain creditors were favored.

It is undisputed that the Debtors' Plan establishes only one class of unsecured creditors (Class 4), who are to share *pro rata* the same distribution of $2 million. There is no creation of a separate class of unsecured creditors that receives an unequal distribution. Further, and contrary to the argument of Central States, the funds in the Trade Account are not property of the estate. The Plan provides that the Trade Account is the property of the Secured Lenders, with any undistributed portion to revert to the Secured Lenders.

Nevertheless, it is also undisputed that the payment that certain "trade creditors" in Class 4 are to receive subsequent to confirmation of the Plan is intended to be higher than that of other unsecured creditors in Class 4, and that the Plan contains certain "means of execution" that facilitate this intended disparity. Therefore, the question under § 1123(a)(4) is whether the payment that creates the difference is provided "under the Plan," and whether the principles of the Bankruptcy Code are undermined notwithstanding that the distribution comes from a "gift" of the Secured Lenders.

It is concluded that under the facts of these cases the existence of plan provisions that facilitate the Trade Account Distribution do not result in a classification issue or provide any other reason to deny confirmation of this Plan. We start with the proposition that members of an unsecured creditors class may have rights to payment from third parties, such as joint obligors, sureties and guarantors, and these rights may entitle them to a disproportionate recovery compared to other creditors of the same class (up to a full recovery). *See, e.g. Ivanhoe Bldg. & Loan Assn v. Orr,* 295 U.S. 243 (1935); *Security Nat'l Bank v. Gessin (In re Gessin)*, 668 F.2d 1105, 1107 (9th Cir. 1982); *In re Realty Assocs. Sec. Corp.*, 66 F. Supp. 416, 424 (E.D.N.Y. 1946). The existence of such

additional rights to payment does not create a classification problem under § 1123(a).

Indeed, a debtor is entitled to voluntarily repay a debt, 11 U.S.C. § 524(f), provided the

repayment is truly voluntary.  *See In re Birakoye Nassoko*, 2009 WL 1578541

(Bankr.S.D.N.Y. June 5, 2009).  This may result in the debtor providing a benefit to

certain creditors that is disproportionate to the plan recovery, but it has never been

thought to raise any question of plan classification.

Since there is no principle that would preclude the Secured Lenders from making

the "gift" totally outside the Plan and the chapter 11 process, the further question is

whether the fact that certain provisions of the Plan facilitate the "gift" and provide that it

is one of the  "means of execution of the Plan" should cause the Court to invalidate it.

Under the circumstances, the provisions of the Plan relating to the Trade Account

Distribution are immaterial and do not cause it to be an inappropriate distribution "under

the Plan."  The fact that the Plan provides for an administrator to make the distribution

and for the Court to resolve any disputes does not implicate the classification scheme

under the Plan.  Indeed, if the Court excised the gift provision from the Plan, the

recoveries of the "disfavored" Class 4 creditors would not be increased.  This would only

put the "gift" at risk by providing the Secured Lenders with an opportunity to withdraw

their offer.  It would also make it much more difficult to resolve disputes as to who is a

trade creditor, since the Court would have no jurisdiction over the issue, and the process

would be carried out by the Secured Lenders alone or be subject to an expensive and

extended proceeding under State law.  This would not benefit any party.[7]

---

[7] Indeed, the Plan means of execution that facilitate the "gift" are not material in the context of this case.
The Second Circuit has cautioned that a plan should not be denied confirmation because of a "technicality"
or "harmless error."  *See Johns-Manville Corp.*, 843 F.2d at 648.

A more negative result would take place if the Court were to deny confirmation of the Plan altogether on grounds that it provides unequal treatment to unsecured creditors. At least two possibilities would arise under this scenario: (i) the Debtors and the Secured Lenders could propose another Plan that provides no recovery for the general unsecured class as a whole, and the Secured Lenders could then pay the trade creditors after confirmation of that Plan if they chose to do so; or (ii) the Secured Lenders could decide not to pay any other party and perhaps attempt to foreclose outside chapter 11 altogether. This would jeopardize the recoveries of all general unsecured creditors who overwhelmingly voted to accept the proposed Plan and create the possibility of a result that would contravene the overriding purpose behind chapter 11 of maximizing the going concern value of a debtor's business for the benefit of its stakeholders. *See* 526 U.S. at 453.

Moreover, it is equally important that the Secured Lenders' "gift" is not being used for an "ulterior purpose," to use the Second Circuit's term in *Iridium*. The Court credits the testimony of the Debtors' chief restructuring officer, Robert Conway, who testified that the "gift" is necessary to ensure the goodwill of trade creditors essential to the Debtors' post-confirmation survival. The goal of the "gift" is in accordance with the overriding purpose of chapter 11 that going concern value be preserved or enhanced. *See LaSalle St. P'ship,* 526 U.S. at 453.

In the first version of the Plan, filed with the petitions, it was proposed that the unsecured creditors receive no distribution and be deemed a class that automatically rejected the plan. *See* 11 U.S.C. §1126(g). This reflected the provisions of the prepetition plan support agreement that committed the Secured Lenders to paying a subset of the

unsecured creditors in full, without providing any recovery to the unsecured creditors as a class. The Court expressed concern that this could put the Creditors Committee in an untenable position, in that some of its members might not want to jeopardize their recovery and the Committee might be deterred from fulfilling its statutory duty of attempting to negotiate a plan that would benefit the entire class. *See* 11 U.S.C. §1103(c). In its objection to Plan confirmation, Central States relies heavily on the Court's previously expressed concerns.

The Court is satisfied that the Creditors Committee acted appropriately and ably in these cases and that the "gift" is not being made for ulterior purposes. As for the role of the Creditors Committee, it has three members: one trade creditor and two non-trade creditors, one of which is Central States itself. It thus has a majority of disfavored creditors. The Committee, represented by an experienced and able law firm, negotiated an amendment to the Debtors' original plan that provides for an approximate 9% distribution to all unsecured creditors, notwithstanding that the Secured Lenders are undersecured by more than $350 million and that their liens are not subject to challenge. The Committee's actions dispel any concerns about its *bona fides*.

As for the question of ulterior purposes, Class 4 has been given the opportunity to vote on the Plan, and both the favored and the disfavored members of the class have voted overwhelmingly to accept it. The Debtors and the Secured Lenders have explained why certain creditors have been favored. There has not been any contention that the Plan has not been proposed in "good faith," as required by 11 U.S.C. 1129(a)(3), and the facts of record dispel any such concerns. Central States' objection is accordingly denied.

**B. The Guild's and State of Connecticut's Objections**

The Guild and the State of Connecticut oppose confirmation of the Debtors' Plan, arguing that the Incentive Plan violates certain parts of § 503 of the Bankruptcy Code and that the terms of the Incentive Plan are unreasonable within the meaning of § 1129(a)(4).

The first issue is whether confirmation of a chapter 11 plan can be denied on the ground that its provisions violate § 503 of the Bankruptcy Code. As previously stated, § 1129(a)(1) provides that a plan must comply with all "applicable" provisions of the Code. The legislative history of § 1129(a)(1) suggests that the term "applicable provisions" means "the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of plan." S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978); H.R. Rep. No. 595, 95th Cong. 1st Sess. 412 (1977); *see also* 7 *Collier on Bankruptcy* at ¶ 1129.03[1]. The Second Circuit has said, "It is doubtful that violations of Code provisions unrelated to the form and content of a plan, such as voting procedures, implicate subsection 1129(a)(1) at all." *Johns-Manville Corp.*, 843 F.2d at 649. This would end the objection based on § 503.

On the other hand, some courts have relied on § 1129(a)(1) to deny confirmation of a reorganization plan that contravenes provisions of the Code not found within chapter 11. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 245-47 (3d Cir. 2000) (considering under § 1129(1)(a) objections to confirmation premised on § 524); *In re Beyond.com Corp.*, 289 B.R. 138, 143-44 (Bankr.N.D. Cal. 2003) (plan that contravenes §§ 327, 330 and 554 would not comply with §1129(a)(1)). In any event, the Court need not decide this issue in these cases. Analysis of the objections of the Guild and the State of Connecticut based on § 503 reveals that their underlying arguments are flawed.

First, the incentive payments provided for in the Plan are not being allowed as administrative expenses under § 503 of the Bankruptcy Code, which governs the allowance of administrative expenses "for the actual, necessary costs and expenses of preserving a debtor's bankruptcy estate." § 503(b)(1)(A).[8]  The Debtors filed a motion during the cases for approval of the Incentive Plan, but thereafter withdrew that motion and incorporated the Incentive Plan in the Reorganization Plan, making anomalous any argument that the incentive payments are "actual" and "necessary" costs and expenses of the estate.  Moreover, § 503 generally has two overriding policy objectives: (i) to preserve the value of the estate for the benefit of its creditors and (ii) to prevent the unjust enrichment of the estate at the expense of its creditors.  S*ee Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir.1986); *see also American A. & B. Coal Corp. v. Leonardo Arrivabene, S.A.,* 280 F.2d 119, 126 (2d Cir.1960).  This dual objective is embodied in the "preserving the estate" language of the statute and requires that allowed administrative claims arise from transactions with the estate.  The bonuses payable under the Incentive Plan are not being paid to preserve the value of the estate or to prevent unjust enrichment of the estate, as they are being paid subsequent to confirmation of the Plan and as a result of the confirmation order itself.

"A confirmed plan takes on the attributes of a contract," *see Charter Asset Corp. v. Victory Markets, Inc. (In re Victory Markets, Inc.),* 221 B.R. 298, 303 (2nd Cir. BAP 1998), by which the estate ceases to exist, "a reorganized debtor" comes into being, and its obligations arise.  *See In re Cottonwood Canyon Land Co.,* 146 B.R. 992 (Bankr.D.Colo. 1992); *Blumenthal v. Clark (In re Hiller),* 143 B.R. 263 (Bankr.D.Colo.

---

[8] Like the rest of § 503, subsection 503(c) applies only when the proposed bonuses are to be paid as administrative expenses of a bankruptcy estate.  *See In re Airway Industries, Inc.* 354 B.R. 82, 86-88 (Bankr.W.D.Pa. 2006).

1992).  Therefore, courts generally deny administrative claim status to expenses that become payable upon confirmation of a chapter 11 plan and not before.  *See*, *e.g., In In re HNRC Dissolution Co.,* 343 B.R. 839 (Bankr.E.D.Ky. 2006); *In re Barker Medical Co., Inc.,* 55 B.R. 435, 435 (Bankr. M.D.Ala. 1985).[9]

In any event, the Incentive Plan does not violate § 503(c).  Subsection 503(c) was added in 2005 as part of the amendments to the Bankruptcy Code, and it curtails payments of retention incentives or severance to insiders, as well as bonuses granted to other employees without factual and circumstantial justification.  Specifically, § 503(c)(1) provides that "there shall neither be allowed, nor paid . . . a transfer made to, or an obligation incurred to the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the business" unless certain specific conditions are satisfied.  In these cases, after confirmation of the Plan, key employees are entitled to receive payment pursuant to the Incentive Plan, even if they were to leave the company before or after the bonus payments.[10]  Therefore, the principal purpose of the Incentive Plan is not to induce participating employees to remain with the Debtors, and § 503(c)(1)

---

[9] Also missing for administrative expense status is the requirement that expenses arise from the incurrence of "actual and necessary" costs to preserve the estate, as the Incentive Plan proposes to award bonuses for services already rendered and compensated in accordance to the participants' employment contracts.  *See Bachman v. Commercial Financial Services, Inc. (In re Commercial Financial Services, Inc.)*, 246 F.3d 1291, 1296 (10th Cir. 2001) (no right to administrative claim payment where debtor had complied with obligations under employment contract).

[10] Section 4.3(c) of the Incentive Plan provides, as follows:

> If, on or after a Performance Objective Date but prior to the date on which the applicable Bonus Award is paid, a Participant's employment with the Company or an Affiliate, as applicable, is terminated (i) by the Participant, or (ii) by the Company or an Affiliate, as applicable, without Cause, such Participant will remain entitled to be paid such Bonus Award on its regularly scheduled payment date (based on the degree of achievement of the applicable Performance Objective).

(Post-Emergence Incentive Plan, § 4.3(c), ECF Doc. No. 440.)

does not apply.  *See In re Dana Corp.*, 358 B.R. 567, 571, 575-77 (Bankr.S.D.N.Y. 2006).

Subsection 503(c)(2) precludes "a severance payment to an insider of the debtor" unless certain conditions are met.  Bonus payments under the Incentive Plan are not triggered by a termination of employment event, as is normally the case with severance payments. *See Straus-Duparquet, Inc. v. Local Union No. 3, IBEW*, 386 F.2d 649, 651 (2d Cir. 1967) (defining severance payments as "compensation for the termination of the employment relation").  Accordingly, § 503(c)(2) is also inapplicable. *See Dana Corp.*, 358 B.R. at 576, 578.

Finally, § 503(c)(3) prohibits "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition."  By including the Incentive Plan in their Plan of Reorganization, the Debtors have subjected the Incentive Plan to the heightened disclosure, notice, and hearing requirements of the Plan confirmation process, and they have given affected parties the opportunity to vote on it. The vote has been overwhelmingly positive.  Moreover, the Secured Lenders, who as the proposed owners of the Reorganized Debtors will bear the financial burden of the Incentive Plan, have overwhelmingly accepted the Debtors' Plan, and the recoveries of unsecured creditors such as the Guild and the State of Connecticut are not affected by the Incentive Plan.  The facts and circumstances of these cases therefore justify the Incentive Plan, as required under § 503(c)(3).  *See In re Airway Industries, Inc*., 354 B.R. at 86-86

(finding §503(c) inapplicable where, among other things, a bonus plan was funded with

non-estate assets and had no effect on the objecting creditors' recoveries).

The conclusion that the Incentive Plan is not being allowed or disallowed as an

administrative expense subject to the requirements of § 503(c) of the Bankruptcy Code is

bolstered by the fact that there is a subsection of § 1129 that is directly applicable and

that one of the objecting parties principally relied on at the confirmation hearing.  Section

1129(a)(4) of the Bankruptcy Code requires that "any payment made or to be made by

the proponent, by the debtor . . . for services or for costs and expenses in or in connection

with the case, or in connection with the plan and incident to the case, has been approved

by, or is subject to the approval of, the court as reasonable."  "The requirements under §

1129(a)(4) are two-fold.  First, there must be disclosure.  Second, the court must approve

of the reasonableness of payments."  7 *Collier on Bankruptcy* at ¶ 1129.03[4]. "Section

1129(a)(4) is designed to insure compliance with the policies of the Code that (1) the

bankruptcy court should police the awarding of fees in title 11 cases and (2) holders of

claims and interests should have the benefit of such information as might affect the

claimants' decision to accept or reject the plan." *In re Future Energy Corp.*, 83 B.R. 470,

488 (Bankr.S.D.Ohio 1988); *see also In re Burlington Motor Holdings, Inc.*, 217 B.R.

711, 716 (Bankr.D.Del. 1997), *vacated on other grounds*, 1998 WL 864827 (D.Del.

1998) (Section 1129(a)(4) requires that creditors be given the "opportunity to factor the

[proposed payments] into their decision whether to accept or reject the plan.").  Although

most of the cases under § 1129(a)(4) relate to fees of professionals, the subsection also

governs other payments for "services in or in connection with the case."  *See Leiman v.*

*Guttman,* 336 U.S. 1, 5, 8, (1949) (noting that section 221(4) of the Bankruptcy Act, the

27

statutory precursor to § 1129(a)(4), is applicable to a broad array of payments); *In re*

*National Paper & Type Co.*, 120 B.R. 624, 627 (D.P.R. 1990) (considering

reasonableness of fees payable to financial institutions as part of plan funding).

The determination whether a payment is reasonable under § 1129(a)(4) requires

an analysis of the issue of reasonableness based on the facts and circumstances of the

payments.  As one Court has stated, the issue of reasonableness

> will clearly vary from case to case and, among other things, will
> hinge to some degree upon who makes the payments at issue, who
> receives those payments, and whether the payments are made from
> assets of the estate. In the typical case, payments that are not
> payable from, or reimbursable by, the bankruptcy estate should not
> engender anything like the judicial scrutiny devoted to those that are
> payable out of the bankruptcy estate. . . Bankruptcy courts . . .
> should be chary about succumbing to the exhortations of litigants to
> turn 1129(a)(4) into a mandate for an expensive and unnecessary
> inquiry.

*Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d

503, 517 (5th Cir. 1998), *cert. denied*, 526 U.S. 1144 (1999).

As stated above, the Incentive Plan will be paid after the effective date of the Plan

from assets that will be owned by the Secured Lenders.  The Debtors' Disclosure

Statement and the Plan fully disclosed the Incentive Plan, giving the holders of unsecured

claims an opportunity to factor the payments into their decision whether to accept the

Plan, which they did overwhelmingly.  Moreover, the Creditors Committee endorsed the

Incentive Plan as reasonable, and the Debtors' chief operating officer, who is an

experienced restructuring professional, testified without contradiction that the Incentive

Plan is reasonable.  There is no suggestion that it is not in line with the market for

compensation of the top executives of similar companies. Compliance with § 1129(a)(4) has been established.[11]

Based on the foregoing, the objections to the Incentive Plan are overruled.

## C. The Minority Shareholders' Objections

Most of the objections the *pro se* Minority Shareholders have interposed to confirmation of the Debtors' Plan are inconsistent or unrelated to the requirements of § 1129. For example, one of the objections is premised on the view "that the Debtor is in a unique position to pioneer a new model for distribution [of publications] . . . which can be replicated throughout the United States." (Kalodner Objection to Confirmation, p. 2, ECF Doc. No. 426.) "Upon the proposed denial of confirmation [this objector] will move for the dismissal of this proceeding on the grounds that such is in the best interest of its secured and unsecured creditors, including most particularly, Debtor's Secured Lenders.…" *Id.* Then the objector will ask "fellow stockholders to elect directors committed to the drastic changes" that are purportedly needed. *Id.* The other objection "submits that the plan of reorganization should be amended to not treat unfairly the common stock equity holders (class 5) by allocating a minimum of 10% of the reorganized Journal Register to them (with management receiving the additional 10%) or, preferably, allocating the full 20% allowed by the lenders to the common stock equity holders." (Freedman Objection to Confirmation, ¶ 14, ECF Doc. No 425.)

These objections are wholly out of order. The Court is not authorized to deny confirmation of a Plan so it can direct the Debtors to take a vote of shareholders to

---

[11] In a handwritten letter received by the Court on July 1, 2009, an employee of the Debtors questioned the fairness of the Incentive Plan on the ground that many employees have been forced to take substantial pay cuts, and the Incentive Plan fails to reward the efforts of all of the Debtors' employees. Although the Court understands such concerns and the sacrifices that many employees have made, it has no legal authority to order the Debtors to provide for a different Incentive Plan.

replace management and adopt a new business plan.  It is also not required to amend a plan to provide a recovery to stockholders where the record establishes that the Secured Lenders are undersecured by more than $350 million and the unsecured creditors are receiving only about a 9% recovery.

Nevertheless, the Court is required to satisfy itself as to two matters that are raised by the objections of the Minority Shareholders—the feasibility of the Plan and the best interests test.

### i.   *Feasibility*

A court can only confirm a chapter 11 plan of reorganization after a finding of feasibility, which means that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed under the plan." 11 U.S.C. § 1129(a)(11).  The feasibility standard requires "reasonable assurance of success. Success need not be guaranteed." *Johns-Manville Corp.*, 843 F.2d at 649. "[T]he test is whether the things which are to be done after confirmation can be done as a practical matter under the facts, [t]he mere potential for failure of the plan is insufficient to disprove feasibility." *S & P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D.Ind. 1995) (internal quotations and citations omitted; alterations in original).

The Debtors have provided credible financial projections and testimony regarding the post-confirmation availability of funds to maintain their operations and obligations. *See In re SM 104 Ltd.,* 160 B.R. 202, 234 (S.D.Fla.1993).  Robert Conway, an experienced restructuring professional, testified that the Reorganized Debtors will be able to make all payments required under the Plan while conducting ongoing operations.  His

testimony is supported by financial projections CDG prepared that show that even under a worst-case scenario the Reorganized Debtors would be able to satisfy their obligations and capital expenditure needs. The Debtors have also provided the Court with an exit financing commitment letter. *See In re Made in Detroit, Inc.*, 299 B.R. 170, 180 (Bankr. E.D. Mich. 2003). The Secured Lenders, whose recovery rests entirely on the success of the Reorganized Debtors, raise no feasibility issues. The Court is satisfied that the Debtors' Plan is feasible.

### ii. Best Interests Test

Compliance with the so-called best interests test is also necessary for confirmation of a chapter 11 reorganization plan. *See* 11 U.S.C. § 1129(a)(7). This rule requires that each holder of an impaired claim or interest receive at least as much in the chapter 11 reorganization as it would in a chapter 7 liquidation. Under the best interests analysis, the entitlement of an impaired class is entirely dependent on the hierarchy of interests created by the bankruptcy laws, where "the interests of shareholders becomes subordinated to the interests of creditors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). Accordingly, where it is clear that the bankruptcy estate is not large enough to cover all the creditors' claims, the best interests test of § 1129(a)(7) does not guarantee any recovery to shareholders.

There is no dispute in these cases that substantially all of the Debtors' assets are fully encumbered by valid first priority liens, and that the value of those assets is substantially less than the debt secured. The Debtors have presented credible documentary evidence and expert testimony that the secured creditors of the estate would receive less than a 20% recovery on their claims in a chapter 7 liquidation, leaving no

proceeds available for distribution to unsecured creditors or to shareholders.  The

Minority Shareholders have presented no evidence to the contrary.  Since all creditors are

receiving at least as much or more than they would receive in a liquidation, and Classes 5

and 6 would receive nothing in a liquidation, the Debtors' Plan complies with the best

interests test.

## CONCLUSION

The Plan satisfies the requirements of § 1129 of the Bankruptcy Code.  An

appropriate Confirmation Order will be entered herewith.

Dated: New York, New York
      July 7, 2009


                */s/ Allan L. Gropper*_____
                UNITED STATES BANKRUPTCY JUDGE